**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO: 25-CR-20310-EA**

**UNITED STATES OF AMERICA**

**VS**

**RANIER LANDRY**

_____

**SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE WITH INCORPORATED MEMORANDUM OF LAW**

The Defendant, RANIER LANDRY, ("LANDRY") by and through his undersigned counsel, pursuant to Rule 32, Federal Rules of Criminal Procedure, and the Fifth Amendment to the United States Constitution, respectfully requests that this Honorable Court consider the following in mitigation of sentence.

**INTRODUCTION:**

To start, nothing in this sentencing memorandum and comments at sentencing should be construed in any way to minimize the seriousness of the offense conduct.  He has a serious case pending in State Court in California and is facing sentencing on a serious case in this courtroom.  LANDRY has accrued 9 criminal history points. We do not pretend this criminal history does not exist, but this presentation is to discuss how he got here and solutions which include incarceration.

Standing before the Court is a young man who, in this case, has accepted responsibility by his guilty plea. "To the convicted Defendant, the sentencing phase is as critical as the guilt/innocence phase."  The duties of the prosecution and defense attorneys do not cease upon conviction of the Defendant. While it should be recognized that sentencing is the function of the Court, the attorneys nevertheless have a duty to assist the Court in as helpful a manner as possible. *See* ABA Project on Standards for Criminal Justice: Sentencing Alternatives and Procedures, §18-6.3, "Duties of Counsel." In *this* case, counsel wears the hat of his attorney and officer of the court. Counsel wears other hats, including his involvement in the re-entry community. Counsel has been involved in the re-entry community for approximately 14 years. He is a member of the Board of Directors of Transition

1

Inc., was Vice President for four years, and President for six years. Transition Inc. works with the Miami-Dade County Boot Camp program. We have developed programs that have successfully reduced recidivism. Counsel has worked with Care Court since its inception.  Counsel had a drug and recovery practice in the State Criminal Court for approximately 13 years, representing clients/addicts in cases who were truly *willing* to enter and fully participate in recovery. The work included 12-step programs, residential treatment, and always, mental health therapy and treatment. Last year, counsel opened a not-for-profit legal clinic whose mission is to research and develop programs that can help individuals *before* they enter the criminal justice system. [i]Counsel's experience is just that. While every case is different, LANDRY shares the childhood trauma, background, and drug use of so many other similar defendants facing sentencing.

### THE OFFENSE CONDUCT

LANDRY adopts the stipulated factual basis filed in support of the guilty plea.

### SENTENCING OBJECTIONS

There are sentencing objections to paragraph 26 of the PSI enhancing his sentence 7 levels for use and discharge of a firearm. The objection previously filed notes that he did not possess or discharge a firearm.

### 18. U.S.C § 3553  SENTENCING FACTORS

In Title 18 U.S.C. § 3553(a), Congress mandated that a court "impose a sentence sufficient, but not greater than necessary to comply with" federal sentencing goals. *See, Kimbrough vs. United States*, 552 U.S. 85, 101 (2007). The § 3553(a) factors that a district court must consider include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for the sentence imposed to afford adequate deterrence; (4) the need to protect the public; (5) the need to provide the defendant with educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) the pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. §3553(a)(1)-(7). *See United States v. Ramirez,* 311 Fed. Appx. 192, Case 1:99-cr-00718-DMM Document 480

Entered on FLSD Docket 03/17/2013 Page 6 of 24-7-194 (11th Cir. 2008)

**<u>Nature and Circumstances of this Offense and the History and Characteristics of the Defendants History:</u>**

The offense conduct in this case is serious. It involved numerous victims. They were scared.  However, without minimizing the conduct, to the extent that he did not use a real firearm, his use of an air gun may be mitigating.

**<u>The need for the sentence imposed to reflect the seriousness of the offense:</u>**

We reiterate our position stated above.

**<u>Deterrence</u>**

There are two types of deterrence. First, general deterrence. Studies show that the length of the sentence has little effect on deterring the general populace.

Research studies show that the severity of punishment does not have as much of a general deterrent effect on crime as the certainty of being apprehended and punished. The Sentencing Project, a national non-profit organization engaged in research and advocacy on criminal justice policy issues, published the following findings:

• Research to date generally indicates that increases in the certainty of punishment, as opposed to the severity of punishment, as more likely to produce deterrent benefits.

• The Institute of Criminology at Cambridge University was commissioned by the British Home Office to conduct a review of research on major studies of deterrence. Their 1999 report concluded that "…studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.

• Daniel Nagin and Greg Pogarsky, leading scholars on deterrence, conclude that "punishment certainty is far more consistently found to deter crime than punishment severity, and the extra-legal consequences of crime seem at least as great a deterrent as the legal consequences."

The empirical evidence strongly states that there is no relationship between sentence length and general deterrence, regardless of the type of crime. *See* Andrew von Hirsch et al., Criminal Deterrence and Sentence

3

Severity: An Analysis of Recent Research (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28 29 (2006) ("[I]increases in severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) (finding no difference in deterrence for white-collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame"). The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004) ["U.S. Sent'g Comm'n, Measuring Recidivism"]. *See also* Part IV.A.3, infra. And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S (2011). We are not suggesting that there is *no* deterrence value to the public for some individuals or cases. Certainly, in cases where the defendant is an addict or mentally ill, the executive functioning or process of the brain is damaged and unable to function like a normal brain.

**Individual Deterrence**

Counsel's experience indicates that the length of a sentence of imprisonment does have a deterrent effect on some individuals. However, the question remains: How much punishment is necessary to achieve individual deterrence? After the passage of the First Step Act, defense attorneys had the opportunity to seek the release of our crack cocaine clients who were finishing their 30—or 40-year sentences. It became clear that most were greatly affected by these lengthy sentences and had no desire to return to their old way of life. It also became clear that these results could have been achieved without these *astronomically* long sentences.

 For an addict, there is value in deterrence. Over thirteen years, counsel has represented dozens and dozens of addicts in State Court from all walks of life.  Counsel recommended strict conditions of probation consistent with supporting recovery from addiction. When the client tested dirty or violated one of the conditions, the state prosecutor would immediately suggest releasing them on community control or house arrest. Counsel objected and, through experience, learned the obvious. If you relapse on probation – you are not going to make it on house arrest or community control. Counsel left clients in jail. The additional jail time allowed not only the drugs to leave their system but also acted truly as a deterrent and strengthened their willingness to work toward recovery. The additional time allows the brain to calm down, allowing additional perspectives, belief systems, and modified behavior to occur.  However, there is still a need to provide the defendant with educational, recovery training, and mental health care that barely exists in our local jail facilities.  When there is more clarity, the client realizes they do not want to return to jail or the absolute darkness of addiction.

However, counsel has not had the same experience for individuals who are dual diagnosis, mentally ill, and drug addicts. Certainly, the client has trauma related maladies, and drug addiction, which is running the show, drug addiction or trauma illness?  In our case, as is explained below, LANDRY'S drug addiction and trauma have been the headline for him and his family since he was a child.

**The need to provide the defendant with educational or vocational training or medical care:**

LANDRY has been jailed previously. He was in prison in the State of California. Most State penal systems

offer little in the way of significant mental health care, specifically as it relates to childhood trauma. The State of Florida has done little to understand, become aware of, or develop programs and solutions for mentally ill inmates. We now have a drug court. Drug courts have certain restrictions that make active addicts with numerous criminal cases eligible for entry.

Counsel has worked with CARE Court since its inception. That is in addition to Transition Inc. Judge Steve Leifman is a former Transition Inc. Board of Directors member and is now on our Board of Trustees. Judge Leifman has mentored undersigned counsel in service and community-based programs for reentry. Judge Leifman is opening a new mental health facility, including a mental health court, full wrap-around services, and housing. Why? Because up to 70 % of our local jail population consists of individuals who are addicts, are mentally ill, and or suffer from PTSD, which counsel refers to as copy-and-paste trauma. LANDRY falls directly into all categories. Mentally ill, addicted and childhood trauma. At sentencing, we will be requesting numerous conditions of supervised release, which may also include residential treatment if necessary. His evaluation and workup will help determine the next step to assist him in re-entry.

**The kind of sentencing available and the guideline range:**

LANDRY is facing imprisonment, and we believe a sentence below the advisory guideline range is appropriate.

**The need to avoid sentencing disparities:**

We are unaware of the severity of the co-defendants' criminal histories, so do not opine on this factor.

**The need to make restitution to the victim:**

For LANDRY, this may be one of the most important factors in sentencing. While the statute requires financial restitution, which requires that LANDRY fully participate in making financial restitution, there are other types of restitution. Becoming aware of his behavior, learning to live on life terms, and learning not to act on every impulse, feeling, and thought is restitution, not just to these victims, but to potential victims in the future. Becoming accountable and learning the power of honesty is also restitution to these victims and, more importantly, will ensure that there will be no victims in the future.

**Mental Illness:**

We begin this discussion with the fact that statistics on mental illness, and crime are great and the solutions

challenging: ☐

*Each year, more than 15 million criminal cases enter our nation's state courts. Of the approximately 10 million jail admissions each year, approximately 20 percent are people with serious mental illnesses (SMI). That means that about two million people enter jails annually with a significant level of impairment due to a mental illness, and many more have mental health needs that have not reached that level of severity. About three-quarters of people with SMI also have co-occurring substance use disorders. According to the Bureau of Justice Statistics, just over 60 percent of people in jails meet the criteria for drug abuse or dependence. See,* Improving the Courts' Response to People with Mental Illnesses. Criminal Justice 2020. By Judge Steve Leifman And Hallie Fader-Towe.

For those with comorbid substance use disorders. specialized management by an addiction specialist

should be considered, and alternative treatments should be discussed promptly " *See*., Mental Health and

Risky Behaviors in the Context of Criminology, HSOA Journal of Forensic, Legal & Investigative

Sciences. (2020).

**History:**

In our case, LANDRY has a tsunami of factors consistent with this analysis.  Paula Herrera LCSW

did a detailed evaluation of him including his background and present diagnosis. His familial history is

not surprising. As stated in the evaluation, he was exposed to drugs at an early age.

*Mr. Landry's father has a long history of substance abuse, criminal involvement, and incarceration. He reported witnessing his father use and sell drugs from a very young age. One of his earliest memories, at approximately four years old, is watching his father inject heroin as he produced the substance. He described this moment as deeply disturbing and formative, stating that it normalized drug use at an age when he had no ability to process or understand it.*

LANDRY has numerous siblings, some of whom have a history of criminal conduct and prison.

He has has two half siblings that are mentally challenged. He has a history of exposure to guns and

violence. This experience is the basis for his trauma and includes:

*Mr. Landry reported that by the age of four, he was already exposed to violence, drug activity, neglect, and instability. At the age of five, Mr. Landry recalled handling a firearm that his father left unattended on a table. This incident resulted in a "whooping" or severe physical punishment, further reinforcing the presence of violence and danger as normal components of his environment. By the age of seven, he described being involved in "adult situations,"   i including hustling on the streets and learning to survive independently*

The home environment caused him to retreat to the streets where he received a course in how to survive, how to use of guns and how to access and use drugs.

*Mr. Landry described his upbringing as "hostile," noting that violence was not an exception but a constant presence. Gangs dominated his neighborhood, and shootings were frequent. He explained that survival required constant vigilance, emotional toughness, and detachment. Over time, this environment shaped his worldview and emotional responses, making hypervigilance and self-protection necessary for daily functioning.*

*Mr. Landry reported that trauma became normalized within his community. Violence, death, and loss were routine occurrences rather than isolated events. He explained that this reality fundamentally shaped his sense of safety, emotional regulation, and expectations of life. These early experiences laid the foundation for maladaptive coping strategies and impaired decision-making that persisted into adolescence and adulthood.*

He had numerous traumatic experiences on the street including witnessing the shooting death of his 13-year-old cousin and shortly thereafter witnessing the violent death of his brother. Each time he was released from jail, he returned to the neighborhood.  We are not reinventing the wheel. It is absolutely imperative that he not return to his old neighborhood or any neighborhood where he spent time, used drugs or committed crimes.

Clinically Ms. Herrera opines:

*From a clinical perspective, the cumulative impact of repeated traumatic losses, unresolved grief, and prolonged exposure to violence is consistent with complex trauma. Individuals with this history often have trouble regulating emotions, impaired judgment under stress, diminished threat perception, and a tendency toward survival-based decision-making. These factors are highly relevant to understanding Mr. Landry's psychological functioning at the time of the offense.*

His drug addiction is a direct result of seeking to medicate trauma. Counsel calls this copy and paste trauma. Ms. Hererra notes:

*Mr. Landry reported that he began secretly drinking alcohol in 2008 at age ten and then socially around fifteen years old. He reported that his alcohol use has never been a problem noting that he only consumes it socially with friends. Mr. Landry also began smoking marijuana around ten years old and continued to use it until his arrest.*
*Mr. Landry's drug use increased with ecstasy in 2016, and in 2017 consistently began abusing cough syrup, powder and crack cocaine, and crystal methamphetamine. Mr. Landry then moved on to using Percocet and oxycodone in 2019 and used either one of those substances daily until his arrest. He began using mushrooms in 2020 and molly in 2021. Mr. Landry started using heroin in 2023, LSD in 2025 and experimented with valium and other narcotics. He reported that his drugs of choice are heroin, Percocet, and oxycodone and that the only time he has been sober is when he has been in custody. Mr. Landry's sister Raven confirmed his extensive drug use and advised that would greatly benefit from treatment. His girlfriend, Jamiana also*

*certified his drug use and agrees that Mr. Landry needs substance use treatment. Mr. Landry reported early and repeated exposure to drugs due to his father's lifestyle and the environment in which he was raised. Substance use was normalized from a very young age, and he stated that it became part of everyday life. He does not report being raised with healthy coping strategies or education regarding substance use. He believes this normalization significantly influenced his own behavior and decision-making.*

The evaluation makes numerous findings regarding how his trauma and addiction greatly affected his behavior and/or ability to control it. She concludes:

> *Mr. Landry also meets criteria for a severe polysubstance use disorder, beginning in childhood and progressing to daily opioid and heroin use in adulthood. His substance use appears to have functioned as a maladaptive coping mechanism for trauma exposure, emotional pain, and environmental stressors. Notably, his only sustained periods of sobriety have occurred in controlled environments, underscoring the need for structured treatment and support.*
> *While Mr. Landry's mental status examination reflects intact cognition, insight, and baseline judgment, his history demonstrates impaired judgment under conditions of stress, threat, or emotional dysregulation. These are patterns commonly observed in individuals with untreated trauma and ubstance use disorders. His criminal behavior is best understood as reflective of these cumulative psychosocial vulnerabilities rather than entrenched criminal intent or antisocial personality traits.*
> *Importantly, Mr. Landry has demonstrated insight into his behavioral patterns, expressed genuine remorse, and articulated a desire to change his life trajectory. His consistent gravitation toward caregiving and youth-focused roles, along with his stated commitment to living a peaceful life free from violence, suggests intact moral reasoning and meaningful rehabilitative potential when provided with appropriate structure, treatment, and support.*

**Good Deeds:**

We have filed letters attesting to LANDRY'S good deeds. These include work he has done in the past mentoring other young men. He has great shame now, given his prior work. He is an intelligent person who has empathy. In addition to the letters, the Court will hear from witnesses about his good characteristics. Counsel can state that last year he had a challenging year relating to his health, in the hospital 9 times. LANDRY was one of the few clients whose contact was not case related but related to his interest in his attorney's health. It was extraordinary. We will expand on this at the time of sentencing.

**CONCLUSION**

LANDRY's criminal conduct and offense behavior must be addressed in this courtroom, and we do not pretend otherwise. There must be a level of accountability for his conduct to ensure there are no further victims. However, from experience, that must include comprehensive mental health treatment, including effective,

9

ongoing therapy, and drug treatment.

Therefore, we request that the Court sentence him accordingly consistent with parsimony.

We request the following recommendations:

- LANDRY be given a full mental health evaluation prior to being released from prison to allow the family, counsel, and Probation to plan for his re-entry, including the appropriate residential facility if necessary.

 - After his release from prison, we request the following conditions of supervised release:

- Mental health treatment as his treating physician/therapist or probation officer deems necessary.

 -That he is medicine-compliant.

 - He attends a 12-step or other type of recovery program as his physician/therapist or probation officer deems it necessary.

-Weekly drug testing.

-Whatever other conditions this Court believes will assist in his recovery. [OBJ]

**DAVID K. TUCKER, P.A.**
Attorney for the Defendant
By: s/*David K. Tucker*
DAVID K. TUCKER
FLA BAR NO: 406023
ATTORNEY NO: 08219
25 Southeast 2nd Avenue, Suite 1105
Miami, Florida 33131
(305) 234-1570- Office
(305)798-5922-Cellphone
Email: david@tuckerdefense.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of Court via CM/ECF. I also certify that the attached motion was served electronically this day on all counsel of record via Notice of Electronic Filing generated by CM/ECF this day 7th day of February 2026.

**By:/S David K. Tucker**
**DAVID K. TUCKER**

---

[i] he Transition Legal Clinic will collaborate with academics at the University of Miami to research recidivism and the factors contributing to ongoing criminal behavior. (Note that as of January 20, 2025, we have added the mission of assisting immigrants and are working with Professor Gomez, the Clinical Professor of Law and Director of the Carlos A. Costa Immigration Human Rights Clinic at FIU Law School).

11